

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-13-00005-CR

MELVIN GLEN CARTER, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 251st District Court
Randall County, Texas
Trial Court No. 22,363-C, Honorable Ana Estevez, Presiding

August 30, 2013

## MEMORANDUM OPINION

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

Appellant, Melvin Glen Carter, appeals his conviction for assault on a public servant and the resulting felony-enhanced twelve-year sentence.[1] On appeal, appellant complains that the trial court abused its discretion when it denied his motion for mistrial based on the State's introduction of inadmissible evidence. We will affirm.

---

[1] See TEX. PENAL CODE ANN. § 22.01(a)(1), (b)(1) (West 2011).

Factual and Procedural History

Two officers from the Amarillo Police Department went to appellant's apartment in March 2011 to serve a warrant for his arrest. When officers knocked on the door, a man who identified himself as Melvin Carter answered the door and, following a period of approximately ten minutes during which appellant claimed to be getting dressed, he did open the door, step outside, and comply with officers' instructions to lie the on floor of the landing outside appellant's second-floor apartment. Officer Blake Henchcliffe grabbed appellant's arm and began to move it toward appellant's back in an effort to place handcuffs on appellant. In doing so and in an attempt to execute the proper procedure for securing an individual so situated, Henchcliffe attempted to lock appellant into position by placing his knee on appellant's shoulder. As he was in the process of doing so, appellant rolled toward Henchcliffe, stood up face-to-face with Henchcliffe, and took a fighting stance toward him with bladed feet[2] and clenched fists.

Henchcliffe explained that his training taught him that when faced with an individual in such a stance, he must "re-engage" the individual, and he did. Henchcliffe attempted to strike appellant with a kick to the legs, which was ineffective, and then, as appellant raised his hands, Henchcliffe attempted to strike appellant with a closed fist, which was also ineffective against appellant. Appellant advanced on Henchcliffe, swung at him, and first grazed the right side of Henchcliff's face. Appellant's second swing made what Henchcliffe described as "solid contact," dazing Henchcliffe and causing cuts to the inside and outside of his mouth. As Henchcliffe and appellant began

_____

[2] Henchcliffe explained that, by "bladed feet," he meant that appellant took a stance in which "[o]ne foot is forward, [and] the other foot is back."

to grapple near the top of the stairs, fellow officer, Corporal Samuel Martinez, then used a Taser on appellant, who, despite the high voltage coursing through his body, continued to act aggressively toward Henchcliffe for some time.[3]   Officers were eventually able to subdue appellant.

Appellant's wife, who witnessed the interaction from the doorway of the apartment, would testify at trial to a strikingly different account of the events.   She explained that Henchcliffe "booted" appellant to the ground as appellant attempted to comply with the officers' verbal commands.   Then, after Henchcliffe caused appellant pain, appellant "popped up" at which time an altercation began.   She described how Henchcliffe beat appellant:

> The officer went to tussling with him.  And when he was wrestling with him, he just -- just grabbed him from behind and just snatched him up and slung him.  And when he slung him, he went to the wall.  And the officer just started beating him in his face.  Just hitting him as hard as he could in his --

She continued:

> He just started hitting him as hard as he could in his face.  And then he -- he went back and kicked him across his chest with his -- with his boot.  He kicked him so hard. Oh, my God, he kicked him so hard.

She elaborated on cross-examination, further describing what she called "a bad beating":

---

[3] Corporal Martinez explained that the voltage emitted from a Taser does not necessarily affect the muscles of the entire body.  In this instance, appellant was hit in the buttocks and upper thigh with the Taser probes, causing the muscles of his lower body to seize up and affecting his balance to some degree.  But appellant was still able to use the muscles of his torso and upper body, apparently allowing him to continue to struggle with Henchcliffe for some time before the officers subdued him.

And he goes to beating him in his face with his fist. He just keep [sic] beating him. And he was beating him so hard to where his head was hitting the wall at the same time he was hitting him.

She testified that appellant's face was red, swollen, and bruised after the "beating," but that he was not bleeding. She testified that appellant did not hit anyone and that she did not know how Henchcliffe's lip was injured. She characterized Henchcliffe as the aggressor, a characterization entirely consistent with Henchcliffe's testimony. Indeed, Henchcliffe testified that, after appellant got up and took a fighting stance and after Henchcliffe began to "preemptively engag[e]" appellant, he, being Henchcliffe, was "absolutely" in the position of aggressor at that point.

Ultimately, appellant was charged with assaulting a public servant as a result of his altercation with Henchcliffe. At a pretrial hearing, the trial court granted appellant's motion in limine to prevent the State or its witness from referring to any of appellants' prior bad acts in the presence of the jury without first having a hearing outside the presence of the jury as to the admissibility of those acts.

At trial and as the State's attorney examined Henchcliffe on the officers' relative positions during the time they were waiting to see whether appellant would emerge from his apartment, the following exchange took place:

Q. If I understand your testimony correctly, as Officer Martinez is continuing his efforts to induce [appellant] to open the door, you then left that area and went somewhere else. Is that accurate or not?

A. That is accurate.

Q. Where did you go?

A. Down the stairwell to the courtyard door where I could see the rear window that leads to his apartment.

4

Q. Why did you do that?

A. As it became apparent that he wasn't going to open the door, Corporal Martinez informed me he has a past history of evading arrest.

At this point, defense counsel immediately sought permission to approach the bench to ask for a conference outside the presence of the jury.

During the bench conference, defense counsel objected to "any testimony from this witness regarding [appellant]'s past behavior," characterizing it as irrelevant and highly prejudicial. The trial court sustained defense counsel's objection and also granted his request for an instruction for the jury to disregard Henchcliffe's testimony at issue. The State's attorney apologized to defense counsel and the trial court and indicated that he would remind the State's witnesses to not refer to prior bad acts. After being instructed to refrain from mentioning any other events which he may have been aware of, the witness also apologized to the trial court. Defense counsel then unsuccessfully moved for a mistrial on the basis of Henchcliffe's testimony, and the jury was returned to the courtroom. Upon the jury's return, the trial court immediately instructed it as follows: "Ladies and gentlemen, I am going to instruct you at this time to disregard the previous answer that was given by the witness."

After hearing all the evidence painting two wildly different accounts of the interaction between appellant and the officers that day, the jury returned its verdict, finding appellant guilty of assaulting a public servant. The trial court imposed punishment of twelve years' imprisonment, and this appeal followed. Appellant now complains that the trial court abused its discretion when it denied appellant's motion for

5

mistrial based on Henchcliffe's testimony referring to appellant's history of evading arrest.

## Standard of Review and Applicable Law

A mistrial is an extreme remedy that is reserved for a very narrow classification of circumstances involving highly prejudicial and incurable errors. See Ocon v. State, 284 S.W.3d 880, 884 (Tex.Crim.App. 2009) (quoting Hawkins v. State, 135 S.W.3d 72, 77 (Tex.Crim.App. 2004) (en banc)). A mistrial is used to halt proceedings when the error involved makes the expenditure of further time and expense wasteful and futile. Id. (citing Ladd v. State, 3 S.W.3d 547, 567 (Tex.Crim.App. 1999)). The decision to grant a mistrial is governed by the particular facts of the case. Id. We review a trial court's decision to deny a motion for mistrial for an abuse of discretion. Id. The denial of the motion for mistrial must be upheld if, when viewing the evidence in the light most favorable to the denial, it was within the zone of reasonable disagreement. See id.

Ordinarily, a prompt instruction to disregard will cure any prejudice arising from a witness's inadvertent reference to an extraneous offense. See Ovalle v. State, 13 S.W.3d 774, 783 (Tex.Crim.App. 2000) (en banc) (per curiam); Rojas v. State, 986 S.W.2d 241, 250 (Tex.Crim.App. 1998). An exception to that rule exists, however, when the testimony is clearly calculated to inflame the minds of the jury or was of such damning character as to suggest that it would be impossible to reverse the harmful impression from the jurors' minds. Rojas, 986 S.W.2d at 250 (citing Kipp v. State, 876 S.W.2d 330, 339 (Tex.Crim.App. 1994); Barnes v. State, 876 S.W.2d 316, 326–27 (Tex.Crim.App. 1994) (en banc) (per curiam); and Kemp v. State, 846 S.W.2d 289, 308

6

(Tex.Crim.App. 1992) (en banc)). We presume that the jury followed the trial court's instruction to disregard unless the evidence is so prejudicial that the instruction was incapable of removing harm. See Wesbrook v. State, 29 S.W.3d 103, 116 (Tex.Crim.App. 2000) (en banc).

## Analysis

Looking at the statement itself and in light of the entire record, we see nothing that would undermine our presumption that the jury followed the trial court's instruction; we see nothing that would suggest that the jury was unable to disregard Henchcliffe's reference to appellant's history of evading arrest. See Gamboa v. State, 296 S.W.3d 574, 581 (Tex.Crim.App. 2009); Wesbrook, 29 S.W.3d at 106.

The reference to evading arrest was delivered in the context of Henchcliffe explaining the relative positions of the officers after they arrived at appellant's apartment. The statement was not highlighted or emphasized. In fact, no other reference to appellant's criminal history was made in the presence of the jury. It would not appear that Henchcliffe's reference to appellant's history of evading arrest was clearly calculated to inflame the minds of the jury. See Rojas, 986 S.W.2d at 250. Henchcliffe's "unembellished reference" to appellant's history of evading arrest was not "so inflammatory as to undermine the efficacy of the trial court's instruction to disregard" it. See Kemp, 846 S.W.2d at 308; see also Orta v. State, Nos. 01-11-00621-CR through 01-11-00625-CR, 2012 Tex. App. LEXIS 5661, at *7–8 (Tex.App.—Houston [1st Dist.] July 12, 2012, no pet.) (mem. op., not designated for publication) (concluding

7

that police officer's statement that defendant "had evaded police twice in a motor vehicle" was cured by an instruction to disregard).

We likewise fail to see that Henchcliffe's statement, in light of the entire record, was so damning in nature that it would be impossible to reverse any harmful impression left in the jurors' minds. See Rojas, 986 S.W.2d at 250. Appellant maintains that, in this case of two very different versions of what took place between the officers and appellant, credibility was key and Henchcliffe's testimonial reference to appellant's history of evading arrest was damaging to appellant's credibility. First, we note that appellant did not testify during the guilt-innocence phase of trial so appellant's credibility as a witness is not really an issue. Further, with respect to the version of events appellant's wife advanced, the jury had other evidence which would shed light on the viability of her account of "a bad beating."

The jury heard, essentially, two accounts of the interaction between the officers and appellant, one account which is consistent with the officers' testimony and the other advanced in large part by appellant's wife's testimony of what she witnessed at the apartment that day. She described how Henchcliffe continuously and severely beat appellant about the face. However, when appellant was booked into jail, officers asked him if he had suffered any recent injuries to which appellant answered "no." The booking photograph taken of appellant later that day did not demonstrate any injuries to appellant's face; it certainly does not depict a man who was beaten to the degree appellant's wife's testimony suggested.

So, the state of the record would not suggest that the jury would be in a position to place a great deal of weight on the passing reference to appellant's history of evading arrest. That is, Henchcliffe's reference to appellant's evading history would not appear to have prejudiced the juror's decision-making process. The jury was presented with two very different accounts of the events—one which was supported by other evidence and one which was not. Henchcliffe's brief reference to appellant's history of evading arrest was not so prejudicial that we could say that it was "clearly calculated to inflame the minds of the jury." See Rojas, 986 S.W.2d at 250. Nor was it of "such damning character as to suggest that it would be impossible to reverse the harmful impression from the jurors' minds." See id. The trial court's prompt instruction to the jury to disregard Henchcliffe's answer was sufficient to cure any prejudice stemming from it. See Ovalle, 13 S.W.3d at 783. We overrule appellant's sole point of error.

## Conclusion

Having overruled appellant's sole point of error on appeal, we affirm the trial court's judgment of conviction. See TEX. R. APP. P. 43.2(a).


Mackey K. Hancock
Justice


Do not publish.

9