*Court of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*



# MEMORANDUM OPINION

No. 04-10-00234-CR

Frank **DOTSON**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 290th Judicial District Court, Bexar County, Texas
Trial Court No. 2010-CR-0565
Honorable Sharon MacRae, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:        Karen Angelini, Justice
                Steven C. Hilbig, Justice
                Marialyn Barnard, Justice

Delivered and Filed:  July 13, 2011

AFFIRMED

Frank Dotson was found guilty of the aggravated assault of Jamie Garnett and was sentenced to seven years and nine months of imprisonment. He brings two issues on appeal: (1) the trial court erred in overruling his Rule 403 objection to the admission of a crime scene videotape; and (2) the trial court erred in denying his motion for mistrial. We affirm.

**BACKGROUND**

On the night of August 24, 2007, Dotson was at a bar on Rittiman Road in San Antonio, Texas, when a fight began inside the bar. The fight began when a man nicknamed "Little" Henry called Sexie Gardner a "bitch." Sexie was at the bar with Demetrius Keno, the father of her child; her friend Shannon; and her friend Rochelle. Hearing what Little Henry called Sexie, Demetrius began to shout at Little Henry. Meanwhile, a man named Jermaine hit Little Henry on the head with a pool stick. The bouncer of the bar then told the individuals involved in the fight to leave the bar. The testimony during trial was not clear how many individuals were told to leave the bar. Among the people who ended up outside in the parking lot were Little Henry, his father "Big" Henry,[1] Demetrius Keno, Demetrius's brother Emile Keno, and Jermaine. At trial, the bouncer testified that when he escorted Little Henry outside, he told Little Henry to come back to the bar another day. According to the bouncer, Little Henry was very angry, went to his vehicle, got a weapon, said "F--- that," and turned back toward the bouncer, firing three shots. The bouncer testified that Little Henry got the gun from Dotson's car. The bouncer quickly went back inside the bar, turned the lights on, and locked the doors. The bouncer testified that from his vantage point inside the bar, he then saw Dotson, Danielle Deroven, and a couple of other people he could not identify shooting towards the cars in the parking lot.

Arthur Randall testified that he had come to the bar with Jamie Garnett, the complainant in this case, so that they could meet Demetrius and Emile Keno. He saw the fight begin inside the bar between Little Henry and Jermaine. Randall then followed Demetrius, Emile, and Jermaine outside to the parking lot. According to Randall, Demetrius told Jermaine that Big Henry was going to get a gun and that Jermaine should leave. Jermaine followed Demetrius's

---

[1] The nicknames "Big" and "Little" referred to the ages of the Henrys. Thus, as the older one, the father was referred to as "Big" Henry, while the younger son was referred to as "Little" Henry.

advice and left in his car. Randall, Demetrius, and Emile then went to Randall's work truck, and Randall got his handgun from his glove compartment and gave it to Demetrius. According to Randall, his intent was to then leave, but Demetrius told him that Demetrius was going to stay until he could find Sexie in the bar. Randall then walked around the front of his truck, and saw Big Henry there with a gun in his hand. Demetrius also had a gun in his hand. According to Randall, Demetrius then asked Big Henry what he had in his hand. Big Henry replied that he had the same thing Demetrius had in his hand. Jamie, who had come from somewhere in the parking lot, then stepped in front of Demetrius and said, "Come on y'all. Y'all don't need to do this." Randall testified that things then seemed better, and he believed the incident to be over. Randall went to his truck and sat inside. As he was turning over his ignition, he heard gunshots. Randall testified the gunshots were coming from between the car in front of his and the SUV on the other side. He saw Demetrius falling back and Jamie duck. Randall then got out of his truck and ran to the back of the truck. Because Randall was still hearing gunshots, he lay down flat on the ground. Jamie then ran toward him and kneeled down by him. Jamie told Randall that she had been shot. Jamie then jumped inside Randall's truck. According to Randall, he still heard gunshots. Jamie then got out of the truck and ran toward the entrance of the bar. Randall followed her in an attempt to make her lay down on the ground. According to Randall, gunshots were coming from different directions, and he thought he might get hit by one of the bullets. By the time he got to the entrance, Jamie had already entered the bar. Randall quickly followed.

Jamie Garnett testified that while the fight was breaking out inside the bar, she was outside in the parking lot selling some cocaine that she had gotten from Jermaine. She was still in the parking lot when the people involved in the fight came outside. She saw Little Henry walking on a sidewalk, bleeding from his mouth. She walked towards Randall's truck when Big Henry

and Little Henry approached. Big Henry had a gun in his hand. According to Jamie, she never saw Big Henry or Little Henry shoot the gun. Instead, "in the middle of the conversation," she heard "a bunch of rounds," which caused her, Demetrius, and Emile to drop to the ground. Jamie estimated that she heard at least twenty to twenty-five gunshots. While lying on the ground, Jamie and Emile discussed that they would run once the gunshots stopped. There was, however, no response from Demetrius. Jamie testified that when the gunshots stopped for a moment, she and Emile tried to get up and run. According to Jamie, as Emile was attempting to get up off the ground, he was shot twice in the chest. Jamie ran to the back of Randall's truck and told Randall that she had been shot. She then jumped into Randall's truck and realized that she had been shot in the hand. She continued to hear gunshots, and the gunshots sounded like they were coming closer to her. So, she jumped back out of the truck and ran toward the bar. According to Jamie, the gunshots followed her to the door and were ricocheting off the glass on the door. The bouncer then let her inside the bar. At trial, Jamie identified the appellant, Frank Dotson, as the man who shot at her. According to Jamie, as she jumped out of Randall's truck, she saw that the person shooting at her was Dotson.

At the time of the shooting, Jason Herrick was on the roof of the bar, servicing the television satellite. Jason heard shouting coming from the parking lot. He heard a woman yell, "I ain't no bitch. You don't call me no bitch." He then heard several gunshots. According to Herrick, he slowly approached the edge of the roof to see what was going on. He saw a man holding a large automatic pistol and saw him fire two rounds toward the parking lot. Herrick then called the police. Herrick continued to hear more gunshots. At trial, Herrick identified Dotson as the man who was shooting the gun.

Edward Wallace, a forensic scientist in the Bexar County Crime Lab's firearms section, testified that "three different 9mm caliber pistols . . . were responsible for firing forty-two cartridge cases" collected at the scene. There were also "two different pistols that were responsible for firing four 40 caliber cartridge cases." And, "there was a single 380 automatic cartridge case," which was also fired from a pistol, but Wallace could not determine what kind of gun it was. All together, there were six firearms used at the scene: three 9mm caliber, two 40 caliber, and one 380 automatic.

There were four victims on the night of the incident: Demetrius Keno, Emile Keno, Jamie Garnett, and a man named Eric Starks. Demetrius and Emile Keno were both killed. Dotson was not indicted for any involvement with those two murders. Dotson was, however, indicted for the aggravated assault of Jamie Garnett. Count I of the indictment alleged that he intentionally, knowingly and recklessly caused serious bodily injury to Jamie Garnett by shooting her with a deadly weapon, a firearm. Count II alleged that he did use and exhibit a deadly weapon, a firearm, and that he intentionally, knowingly, and recklessly placed Jamie Garnett in fear of imminent bodily injury by shooting at her and in her direction with the deadly weapon. Dotson was acquitted of Count I, but was found guilty with respect to Count II.

### ADMISSION OF CRIME SCENE VIDEOTAPE

In his first issue, Dotson argues that the trial court erred in overruling his Rule 403 objection to the admission of State Exhibit 8, a crime scene videotape that, in part, showed the dead bodies of Demetrius and Emile Keno. Dotson argues that showing these two murdered individuals, who were not the victims of the charged offense, violated Texas Rule of Evidence 403.

Rule 403 provides for the exclusion of relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403. According to the Texas Rules of Evidence, videotapes are considered in the same manner as photographs. *See* TEX. R. EVID. 1001(a). In considering the admissibility of a silent videotape under Rule 403, a trial court should use the same analysis as it uses for still photographs. *Gordon v. State*, 784 S.W.2d 410, 411-12 (Tex. Crim. App. 1990). In determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice, the court may consider the following factors: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black and white, whether they are close-up, and whether the body depicted is clothed or nude. *Young v. State*, 283 S.W.3d 854, 874 (Tex. Crim. App.), *cert. denied*, 130 S. Ct. 1015 (2009). A court is not limited by these factors and may also consider the availability of other means of proof and the circumstances unique to each individual case. *Id.* The admissibility of a photograph is within the sound discretion of the trial court, which we review on appeal for abuse of discretion. *Id.* at 874-75.

At issue in this case was whether Dotson committed aggravated assault during an incident involving multiple gunshots, multiple shooters, and multiple victims. State's Exhibit 8, the crime scene videotape, was almost an hour in length and contained no audio. It depicted the investigation of the scene shortly after the shooting. It showed the parking lot where the incident occurred, the vehicles that were parked there, and all the evidence markers indicating (1) the various casings and spent bullets that were located at the scene; (2) the bullet holes in vehicles; (3) blood found at the scene; and (4) the two murdered victims.

We note that a photograph is generally admissible if verbal testimony about the matters depicted in the photograph is also admissible. *Id.* at 875. Here, there was testimony from many witnesses, without objection, about the events depicted in the crime scene video. The video is probative of the manner in which Jamie Garnett was shot and gave the jury a three dimensional perspective in understanding the chaotic sequence of events on the night in question. *See Gordon*, 784 S.W.2d at 412-13. Further, the video did not spend an inordinate amount of time showing the two murdered victims, who were clothed. And, the video was not particularly gruesome. We find no abuse of discretion by the trial court.

Moreover, even if the trial court had abused its discretion in overruling Dotson's Rule 403 objection, any error is harmless. *See* TEX. R. APP. P. 44.2(b). It is well-established that the improper admission of evidence does not constitute reversible error if the same facts are proved by other properly admitted evidence. *Aguilera v. State*, 75 S.W.3d 60, 68 (Tex. App.—San Antonio 2002, pet. ref'd). Here, not only did many witnesses testify about Demetrius and Emile Keno being killed during the incident, but two photographs of their dead bodies were admitted in evidence without objection. Thus, any error in the admission of the videotape is harmless.

### MOTION FOR MISTRIAL

In his second issue, Dotson argues the trial court erred in denying his motion for mistrial. During the guilt-innocence phase of the trial, Dotson called Anthony Hennessee, a witness who was in the parking lot at the time of the incident. Hennessee testified that he heard more than one gun firing and that although he did not see the man's face, the man he saw shooting on the night of the incident did not look like Dotson "body wise." In an attempt to impeach Hennessee, the prosecutor asked Hennessee whether he was on deferred adjudication for indecency with a child at the time of the incident. Before Hennessee could answer, Dotson's counsel objected under

Texas Rule of Evidence 609. The trial court sustained the objection. Dotson's counsel then moved to have the trial court instruct the jury to disregard. The trial court instructed the jury to disregard the question. Dotson's counsel then moved for a mistrial, which was denied.

We review the trial court's denial of a motion for mistrial under an abuse of discretion standard. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). We view the evidence in the light most favorable to the trial court's ruling and uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Id.* We do not substitute our judgment for that of the trial court, but rather we decide whether the trial court's decision was arbitrary or unreasonable. *Id.* Thus, a trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Id.*

Mistrial is an extraordinary remedy appropriate only for "a narrow class of highly prejudicial and incurable errors." *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000). "The determination of whether a given error necessitates a mistrial must be made by examining the particular facts of the case." *Id.* "The asking of an improper question will seldom call for a mistrial, because, in most cases, any harm can be cured by an instruction to disregard." *Id.* "A mistrial is required only when the improper question is clearly prejudicial to the defendant and is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors." *Id.* "Ordinarily, a prompt instruction to disregard will cure error associated with an improper question and answer, even one regarding extraneous offenses." *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000).

Here, the State concedes that the prosecutor's question was improper under Rule 609. However, it argues that the trial court's instruction cured any harm. We agree. The prosecutor's question was quickly objected to, the witness did not answer the question, and the trial court

quickly instructed the jury to disregard. The prosecutor did not mention anything related to the question again. Further, Dotson was acquitted of Count I of the indictment, indicating that the jury was not overcome by emotions, making a distinction between Count I and Count II of the indictment. We therefore find no abuse of discretion by the trial court.

## CONCLUSION

We affirm the judgment of the trial court.

Karen Angelini, Justice

DO NOT PUBLISH