# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00272-CR

**Lehi Barlow Jeffs aka Lehi Barlow Allred,, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF SCHLEICHER COUNTY, 51ST JUDICIAL DISTRICT
NO. 1000, THE HONORABLE BARBARA L. WALTHER, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant Lehi Barlow Jeffs aka Lehi Barlow Allred, pleaded no contest to an indictment accusing him of sexually assaulting a child. *See* Tex. Penal Code Ann. § 22.011(a)(2)(A) (West 2011). The district court adjudged him guilty and assessed punishment at eight years' imprisonment, in accordance with a plea bargain agreement. Appellant brings forward twenty-five points of error. The first twenty-one points assert that the trial court erred by denying his pretrial motion to suppress evidence. The remaining four points complain about the trial court's denial of his motion to quash the indictment. We affirm the conviction.

### I. BACKGROUND

The YFZ (Yearning for Zion) Ranch is a 1,691-acre property near Eldorado in Schleicher County. More than two hundred persons lived on the ranch in 2008, all of them members

of the Fundamentalist Church of Jesus Christ of Latter Day Saints (FLDS). Among the structures on the property were a temple and a temple annex, nineteen residential buildings, a school, a clinic, a warehouse, a water treatment plant, and several commercial buildings. County tax records reflected that the land and improvements were owned by a single entity, YFZ Land, LLC. The ranch property was not subdivided, and there was no evidence that any of the buildings were owned or leased by an individual. The ranch was fenced, and access to the property was controlled by a locked gate, a manned guard house, and observation points.

On March 29 and 30, 2008, six telephone calls were received by the New Bridge Family Shelter Crisis Hotline in San Angelo from a person who identified herself as Sarah Jessop Barlow. She told the shelter workers that she was sixteen years old, pregnant, and the mother of an eight-month-old infant daughter. She said that she lived at the YFZ Ranch and was the fourth wife of Dale Barlow, who she said was sexually and physically abusive to her. She said that she wanted to leave the ranch, but she was afraid of the punishment she would receive if she were caught trying to escape.

The trial court found, and appellant does not dispute, that the hotline employees who took the March 29 and 30 telephone calls believed that they were genuine. In truth, however, the calls were a hoax. There was no sixteen-year-old mother named Sarah Jessop Barlow. Instead, the calls were made by a woman named Rozita Swinton, a resident of Colorado, who apparently made the calls from that state. The hoax was not discovered until April 13, 2008.

The calls to the shelter hotline were immediately reported to the department of family and protective services (DFPS) office in San Angelo and to Schleicher County Sheriff David Doran.

2

In turn, Doran reported the calls to Texas Ranger Brooks Long. On April 1, Long received the call notes from the shelter. He also received documents showing that in August 2007 a Dale Barlow had been placed on probation for three years following a conviction in Arizona for conspiring to commit sexual assault of a minor. On April 2, Long interviewed the shelter workers who had taken the calls, and on April 3, he received their signed affidavits describing the contents of the calls. Long applied for a search and arrest warrant later that day. In summary, Long's probable cause affidavit stated:

• Long had been on the premises of the YFZ Ranch on several occasions and had observed the fences, guard house, and other security measures limiting access to the ranch. Long had spoken to Frederick Merril Jessop, who identified himself as the "authority" at the ranch and the "point of contact" for law enforcement and other government officials who wanted access to the ranch. Jessop had told Long that approximately one hundred persons lived on the ranch.

• On April 2, 2008, Long interviewed Alisa Thomas and Jessica Carroll, employees of the New Bridge Family Shelter in San Angelo. As part of their duties at the shelter, Thomas and Carroll answered telephone calls to the "crisis hotline" available for those persons in need of the shelter's assistance.

• Thomas told Long that on March 29, 2008, she had a forty-two minute conversation on the crisis hotline with a female caller who identified herself as Sarah. Sarah told Thomas that she was born on January 13, 1992, had an eight-month-old child, and was pregnant. She said that she and her child lived with her husband, the father of her child, on a ranch in Eldorado. Sarah told Thomas that her husband hits her and that she would get in trouble if anyone learned that she had called.

• Carroll told Long that on March 29 and 30, 2008, she had multiple telephone conversations on the crisis hotline with a caller who identified herself as Sarah Barlow, maiden name Sarah Jessop. Sarah told Carroll that she was sixteen years old, pregnant, and the mother of an eight-month-old child. She identified her husband and the father of her child as Dale Barlow, age forty-nine. She said that she lived with Barlow at the YFZ Ranch. She said that Barlow was physically and sexually abusive to her. Sarah said that she wanted to escape from the ranch with her child but was afraid to try because of the guard house at the gate. She said that if she were caught trying to leave the ranch she would be locked in her room and denied food. Sarah also described her fear of the outside world, saying that she had been

3

told that outsiders would hurt her. During one of the calls on March 29, Sarah told Carroll that she wanted Carroll to forget she had called.

• Given Sarah's age and the age of her child, Long believed that Dale Barlow had penetrated Sarah's sexual organ with his sexual organ when Sarah was fifteen years old. Long said he "knows of no provision under Texas law for lawful marriage at the age of fifteen."

• Long confirmed through the sheriff that a Dale Barlow, born November 5, 1957, had been arrested in Arizona in July 2005 for conspiracy to commit sexual conduct with a minor. In August 2007, Barlow had been placed on three years' probation for this offense.

• Long believed that Sarah Jessop, her child, and Dale Barlow were currently located at the YFZ Ranch. Long also believed that medical records and other information relevant to the age and true identity of Sarah Jessop, the birth of her child, and her marriage to Dale Barlow could be found at the ranch.

At 5:50 p.m. on April 3, 2008, the judge of the 51st District Court, sitting as a magistrate, signed a warrant to search the YFZ Ranch for records relating to the age and identity of Sarah Jessop, any pregnancy or child of Sarah Jessop, any marriage of Sarah Jessop to any party including Dale Barlow, and any marriage of Dale Barlow to any party, including Sarah Jessop. The warrant also ordered Barlow's arrest.

Also on April 3, the DFPS filed a petition in the 51st District Court for an order in aid of investigation of a report of child abuse. *See* Tex. Fam. Code Ann. § 261.303 (West 2008). Attached to the petition was the affidavit of Ruby Gutierrez, a department caseworker, describing the calls to the hotline and Dale Barlow's Arizona conviction. A few minutes after signing the first warrant, the judge signed an order giving the department investigatory access to Sarah Jessop Barlow and her infant daughter at the YFZ Ranch.

4

Later that evening, Texas Rangers and other police officers acting under the search warrant and DFPS caseworkers acting under the order for investigation entered the YFZ Ranch. The caseworkers immediately began a process of interviewing every female on the ranch between the ages of seven and seventeen. During these interviews, several of the girls reported being married to, and mothers of children with, adult men who lived at the ranch. Some of them also stated that the men to whom they were married had other wives. On the morning of April 4, the police began a structure-by-structure search of the ranch pursuant to the first warrant. They did not find Sarah Jessop Barlow and her infant daughter, nor did they find Dale Barlow.[1] They did, however, observe evidence—several beds in the temple and marriage records—tending to confirm the girls' descriptions of underage sexual activity and bigamy.

On April 6, 2008, Long applied to the judge of the 51st District Court for a second search warrant. The complete probable cause portion of Long's April 6 affidavit is attached as an appendix to this opinion. In summary, the affidavit stated:

> • Long had been on the premises of the YFZ Ranch on several occasions, most recently on April 4, 5, and 6, 2008, and had observed the fences, guard house, and other security measures limiting access to the ranch. Long had spoken to Frederick Merril Jessop, who identified himself as the "authority" at the ranch and the "point of contact" for law enforcement and other government officials who wanted access to the ranch. Jessop had told Long on April 4 that approximately two hundred fifty persons lived on the ranch.
>
> • On April 5, 2008, while conducting a search of the ranch pursuant to the first warrant, Long saw computers, vaults, and locked drawers inside the temple and temple annex. He also saw several beds in the temple, in one of which the linens were disturbed and there was a strand of what Long believed, due to its length, was

---

[1] The evidence shows that Barlow was living in Arizona at the time.

5

female hair. He also saw a document indicating marriages between one man and over twenty wives.

• On April 6, 2008, Long spoke to three DFPS employees, Tina Martinez, Ruby Gutierrez, and Rebecca Baxter. Between April 4 and 6, Martinez, Gutierrez, and Baxter had interviewed eight juvenile females living at the YFZ Ranch. During these interviews, the girls stated that they were in plural marriages with men at the ranch or knew others girls who were. They also stated that they or girls they knew at the ranch had given birth at age sixteen or younger.

• On April 6, 2008, Sheriff Doran told Long that all the residents of the YFZ Ranch are members of the FLDS. Doran also told Long that on April 5, 2008, Doran spoke to a confidential informer who was a former FLDS member and who had given Doran accurate information about the FLDS on more than twenty prior occasions. The informer told Doran that adult male FLDS members practice polygamy, that their brides are often under the age of sixteen, and that there was a bed in the temple in which the men engage in sexual activity with the underage brides.

The judge signed the second warrant at 10:15 p.m. on April 6. The warrant ordered a search of the YFZ Ranch for evidence of marriages between females under the age of seventeen and adult males, and of pregnancies and births by females under the age of seventeen. The warrant was executed immediately.

Appellant and nine other individuals living at the YFZ Ranch were subsequently indicted for sexual assault of a child and bigamy. With the district court's permission, the ten defendants filed a joint motion to suppress evidence. Following a four-day hearing at which all the defendants were represented by counsel, the motion was denied. Also with the district court's permission, the ten defendants filed a joint motion to quash the indictment. Following an eleven-hour hearing at which all the defendants were represented by counsel, the trial court denied the motion.

6

Appellant subsequently entered his plea to the sexual assault indictment and was convicted. This appeal followed.[2]

## II. MOTION TO SUPPRESS EVIDENCE

Appellant contends that the search of the YFZ Ranch pursuant to the April 6 warrant violated his rights under the First and Fourth Amendments, article I, section 9, and article 38.23. *See* U.S. Const. amends. I, IV; Tex. Const. art. I, § 9; Tex. Code Crim. Proc. Ann. art. 38.23 (West 2005). He urges that the evidence seized during this search, which "revealed the identity of Appellant Jeffs and the evidence offered against him in the court below," should have been suppressed. Appellant also contends that his constitutional and statutory rights were violated by the initial search of the ranch pursuant to the April 3 warrant and the interviews conducted by DFPS caseworkers pursuant to the order in aid of investigation. He argues that the information obtained during the April 3 search and interviews was improperly used as "the basis for [the] second [April 6] search warrant which resulted in the seizure of the evidence used against Appellant Jeffs." Appellant's reply brief adds, "What [Jeffs] has sought to suppress is the evidence seized pursuant to the second search warrant . . . ."

A trial court's ruling on a motion to suppress is reviewed for an abuse of discretion. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). This means that the ruling will be upheld if it is reasonably supported by the record and is correct under any applicable legal theory.

---

[2] Appellant also pleaded no contest to a bigamy indictment. His appeal from that conviction is pending in this Court, as are appeals by other individuals who joined these motions and were later convicted.

7

*Id*. The trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give the trial court almost complete deference in determining historical facts, but we review de novo the trial court's application of the law to those facts. *Johnson v. State*, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000).

## DFPS INTERVIEWS

In points of error one, two, three, and sixteen, appellant contends that the interviews of the juveniles at the YFZ Ranch by DFPS caseworkers violated the Fourth Amendment, article I, section 9, and article 38.23 because (1) the petition for the order in aid of investigation contained a material misstatement of fact regarding the department's compliance with the statutory prerequisites for obtaining the order; (2) the petition relied on information, specifically the phone calls to the family shelter hotline, obtained in violation of criminal statutes; and (3) the DFPS caseworkers exceeded the scope of their authority under the order by interviewing every female resident of the YFZ Ranch between the ages of seven and seventeen. In points of error four, five, and six, appellant contends that information obtained during the DFPS interviews was the fruit of these constitutional and statutory violations, was improperly used in the April 6 probable cause affidavit, and should be disregarded in determining whether there was probable cause to issue the April 6 warrant. We overrule all of these points because we conclude that appellant does not have standing to contest the legality of the interviews.

8

The rights secured by the Fourth Amendment and article I, section 9 are personal.

*See Rakas v. Illinois*, 439 U.S. 128, 139 (1978); *Richardson v. State*, 865 S.W.2d 944, 948-49 (Tex.

Crim. App. 1993). A defendant seeking to suppress evidence on the ground that it was obtained in

violation of the Fourth Amendment or article I, section 9 must show that he personally had a

reasonable expectation of privacy that the government violated. *Rakas*, 439 U.S. at 139-40; *Handy*

*v. State*, 189 S.W.3d 296, 299 (Tex. Crim. App. 2006); *Kothe v. State*, 152 S.W.3d 54, 59 (Tex.

Crim. App. 2004); *Richardson*, 865 S.W.2d at 948-49. The same standing requirement obtains under

article 38.23. *Fuller v. State*, 829 S.W.2d 191, 202 (Tex. Crim. App. 1992).

To establish his standing at the suppression hearing, appellant filed an affidavit

stating:

> My name is Lehi Barlow Jeffs . . . . I resided on the YFZ Ranch in Schleicher
> County, Texas on April 3, 2008 and on April 6, 2008, when law enforcement officers
> and agents of the State of Texas entered the YFZ Ranch, located at 2420 County
> Road 300 (Rudd Road), Eldorado, Texas 76936, and searched. The search included
> my personal belongings, including clothing, my furniture, my household goods, my
> personal possessions, my books, my photographs, my records, my computers,
> cameras, my vehicle and computer equipment and computer storage devices, and my
> personal documents. Numerous items belonging to me were seized during
> the searches of April, 2008, including my photographs, my computers, my computer
> equipment, my computer storage devices, cameras, my vehicle, evidence and
> my papers.
>
> I have been a member of the [FLDS] all my life. Beginning April 3 and April
> 6, 2008, and continuing for several days, law enforcement officers and agents of the
> State of Texas entered various Buildings, Outbuildings, Church buildings, including
> the Temple and the Temple Annex, Bishop's Office, Bishop Scrib, and the Big
> House, on the YFZ Ranch, and seized computers, computer equipment, computer
> storage devices, religious records, papers, documents, books, cameras, my vehicle
> and other items containing information about me. I was the victim of the unlawful
> entry on to the YFZ Ranch, located at 2420 County Road 300 (Rudd Road),
> Eldorado, Texas, 76936, and searches incident therero on the YFX Ranch that began

on April 3 and April 6, 2008, and that resulted in the seizure of evidence and other items containing information about me.

Although the State does not question appellant's showing of standing to contest the validity of the searches conducted pursuant to the April 3 and 6 warrants, the State contends that appellant failed to establish his standing to challenge the interviews conducted by the DFPS caseworkers acting pursuant to the order in aid of investigation. The State argues that appellant failed to show that he had a reasonable expectation of privacy that was invaded by the interviews.

Responding to the State's argument, appellant concedes that he does not have vicarious standing to invoke the rights of the juveniles who were interviewed by the DFPS caseworkers. He asserts, however, that this is of "no consequence" because his challenge to the manner in which the interviews were conducted is merely "a predicate to the challenge of the subsequent search warrant." If by this appellant is asserting that he has standing to challenge the DFPS interviews because those interviews provided information used to obtain the second search warrant, the argument fails. For a defendant to have standing on a motion to suppress evidence, it is not sufficient that he "claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else." *Jones v. United States*, 362 U.S. 257, 261 (1960); *see also Rakas*, 439 U.S. at 132-33, 136-37 (rejecting "target" theory of standing); *Fuller*, 829 S.W.2d at 201-02 (holding that defendant did not have standing under art. 38.23 to object to admission of evidence unlawfully obtained from another person). That information learned during the DFPS interviews was used to obtain the second search warrant does not, in itself, give appellant standing to challenge the legality of those interviews.

10

Appellant further argues that he has standing to challenge the DFPS interviews because they were the fruit of his unlawful detention, and that of others living on the ranch, beginning on April 3 when the officers and caseworkers arrived to execute the first search warrant and the order in aid of investigation. Appellant argues by analogy to *Kothe*. In that case, Kothe's automobile was stopped by an officer who suspected that the driver, Kothe, was intoxicated. *Kothe*, 152 S.W.3d at 58. The officer quickly satisfied himself that Kothe was not intoxicated, but he continued to detain Kothe and ultimately found drug paraphernalia in the car and heroin on the person of Kothe's passenger, Brantley. *Id*. Kothe moved to suppress the heroin, claiming that his continued detention after the officer determined that he was not intoxicated was constitutionally unreasonable. The trial court granted the motion to suppress and the State appealed, urging that Kothe did not have standing to challenge the search of Brantley. *Id*. The court of criminal appeals held that while Kothe did not have a reasonable expectation of privacy in the balloons of heroin secreted in Brantley's clothing, he did have standing to challenge his own detention and any fruits of that detention, which under those facts included the search of Brantley. *Id*. at 60-62.

*Kothe* is distinguishable from the instant case. As the court of criminal appeals noted in *Kothe*, it is critical to identify the precise government conduct being objected to, because this will often be determinative of the standing issue. *Id*. at 60. Kothe's Fourth Amendment claim was based upon a purportedly prolonged unlawful detention. In his points of error complaining of the DFPS interviews, appellant contends that the interviews, and the information they revealed, were the fruit of unlawful conduct by DFPS employees, to whom he argues the Fourth Amendment applies. *See Roe v. Tex. Dep't of Protective & Regulatory Servs.*, 299 F.3d 395, 401 (5th Cir. 2002). He contends

11

that DFPS agents violated the Fourth Amendment, and also article I, section 9 and article 38.23, by making a false statement of material fact and using unlawfully obtained evidence in their petition for order in aid of investigation, and by thereafter exceeding the scope of their authority under the order. Unlike *Kothe*, appellant's contentions are not based on any assertion that he was unlawfully detained on April 3, and they do not require a determination as to whether or not appellant was unlawfully detained in order to be resolved.

The order in aid of investigation directed the "parent or person responsible" for the care of Sarah Jessop Barlow and her infant daughter to "immediately allow an authorized representative of the Department of Family and Protective Services to enter . . . [the YFZ Ranch] to interview and examine the children . . . ." Appellant did not claim to be the parent or person responsible for the care of any of the children interviewed by the DFPS caseworkers. In his affidavit in support of standing, appellant affirmed that he was a resident of the YFZ Ranch and a member of the FLDS, that his personal residence was searched and his personal property was seized, and that FLDS premises were searched and church property was seized. Appellant's challenges to the manner in which the DFPS obtained the order in aid of investigation and to the scope of the interviews conducted by its caseworkers under the order are not based on any allegation that the conduct complained of violated appellant's asserted privacy interests or that the interviews were a fruit of a violation of those interests.

Points of error one through three and, as applied to the DFPS order, points of error four through six and sixteen are overruled.

12

## APRIL 3 SEARCH WARRANT

In points of error seven through twelve, sixteen, and seventeen through nineteen, appellant contends that the search of the YFZ Ranch pursuant to the April 3 search warrant violated the Fourth Amendment, article I, section 9, and article 38.23 because (1) the probable cause affidavit on which the warrant was based contained material misstatements and omissions of fact; (2) the telephone calls to the family crisis hotline on which the affidavit relied were not credible and did not support a finding of probable cause to believe that a crime had been committed; (3) the telephone calls to the shelter hotline were obtained in violation of criminal statutes; and (4) the warrant was general and overbroad. In points of error four, five, and six, appellant contends that information obtained during the first search was tainted by these constitutional and statutory violations, was improperly used in the April 6 probable cause affidavit, and should be disregarded in determining whether there was probable cause to issue the April 6 warrant. We do not address the merits of appellant's challenges to the April 3 search, however, because the information gathered during the search was not critical to a finding of probable cause to issue the April 6 warrant.

In his April 6 probable cause affidavit, Long stated that while conducting a search of the ranch pursuant to the first warrant, he saw computers, vaults, and locked drawers inside the temple and temple annex. He also saw several beds in the temple, in one of which the linens were disturbed and there was a strand of what Long believed, due to its length, was female hair. He also saw a document indicating marriages between one man and over twenty wives. Even if that information is redacted from the April 6 affidavit, what remains—the information gathered during the DFPS interviews and received from the confidential informer—was more than sufficient to give

13

the magistrate a substantial basis for concluding that there was probable cause to believe that the offenses of sexual assault of a child and bigamy had been and were being committed at the YFZ Ranch and to issue a warrant to search for evidence of those offenses. *See Illinois v. Gates*, 462 U.S. 213, 236-37 (1983) (decision to issue warrant will be sustained if magistrate had substantial basis for concluding that probable cause was shown); *State v. Delagarza*, 158 S.W.3d 25, 29 (Tex. Crim. App. 2005) (same); *Swearingen v. State*, 143 S.W.3d 808, 811 (Tex. Crim. App. 2004) (same); *State v. Davila*, 169 S.W.3d 735, 738 (Tex. App.—Austin 2005, no pet.) (same).

Accordingly, points of error four through six (as applied to the April 3 warrant), seven through twelve, sixteen (as applied to the April 3 warrant), and seventeen through nineteen are overruled.

### *FRANKS v. DELAWARE*

In points of error thirteen, fourteen, and fifteen, appellant contends that the evidence seized during the April 6 search should have been suppressed because material facts were omitted from the April 6 probable cause affidavit. The Fourth Amendment requires that a defendant be allowed to challenge the veracity of a probable cause affidavit "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). Although appellant also cites article I, section 9 of the Texas Constitution and article 38.23, he does not separately argue his state claims or present any argument asserting that these provisions afford him greater protections than the Fourth Amendment as construed in *Franks*. Accordingly,

14

these state law contentions present nothing for review. *See Manns v. State*, 122 S.W.3d 171, 192 n.97 (Tex. Crim. App. 2003).

By its express terms, the holding in *Franks* applies only to affirmative misstatements contained in a probable cause affidavit. Neither the Supreme Court nor the court of criminal appeals has held that *Franks* applies to omissions of fact, although several lower courts have so held. *See Darby v. State*, 145 S.W.3d 714, 722 (Tex. App.—Fort Worth 2004, pet. ref'd) (collecting cases); *see also Massey v. State*, 933 S.W.2d 141, 146 n.3 (Tex. Crim. App. 1996) ("This Court has indicated that we might not recognize application of *Franks* to omissions of fact."); 40 George E. Dix & John M. Schmolesky, *Texas Practice: Criminal Practice and Procedure* § 9:26 (3d ed. 2011) (stating that omitted fact could be considered material under *Franks* if its inclusion would render affidavit insufficient to show probable cause). For the purpose of this opinion, we will assume without deciding that *Franks* does apply to omissions of fact.

At a *Franks* hearing, it is the defendant's burden to prove the alleged perjury or reckless disregard for the truth by a preponderance of the evidence. *Franks*, 438 U.S. at 156. If the defendant satisfies this burden, and if, with the false material set aside, the remainder of the affidavit is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit. *Id*. We review the trial court's ruling on a *Franks* issue under the same standard applied to search and seizure issues generally: we give almost total deference to the court's rulings on questions of historical fact and mixed questions of law and fact that turn on an evaluation of credibility and demeanor, but we review de novo the trial court's application of the law to those facts. *Fenoglio*

15

*v. State*, 252 S.W.3d 468, 473 (Tex. App.—Fort Worth 2008, pet. ref'd); *see Johnson*, 68 S.W.3d at 652-53; *Carmouche*, 10 S.W.3d at 327.

The facts appellant contends were omitted from the April 6 probable cause affidavit are: (1) the sixteen-year-old caller who identified herself as Sarah Jessop Barlow was not found at the ranch during the initial search, and (2) Dale Barlow, the person suspected of sexually assaulting the caller, was located in Arizona before the first warrant was executed. Relevant to these omissions, the trial court found:

> • Before the April 3 search warrant was executed, Sheriff Doran received a cell phone call from a person claiming to be Dale Evans Barlow. Doran told this caller to "contact the law enforcement where he [the caller] was located" within thirty minutes. Doran never received notice that the caller made such contact.
>
> • "[N]o credible evidence was introduced to support the . . . claim . . . that Ranger Long intentionally or knowingly or with reckless disregard for the truth omitted relevant information in his [April 6] probable cause affidavit[ ]."
>
> • "[N]o credible evidence was introduced to support the . . . claim . . . that Ranger Long acted in reckless disregard for the truth in preparing and presenting the [April 6] probable cause affidavit[ ]."
>
> • "[N]o credible evidence was introduced to support the . . . claim . . . that Ranger Long entertained doubts, much less serious doubts, about the truth of the allegations in the [April 6] probable cause affidavit[ ]."
>
> • "[T]he Defendants failed to present credible evidence to support the claims . . . that the Ranger's probable cause affidavits knowingly or intentionally contained either deliberate falsehoods, deliberate omissions or reckless disregard for the truth."
>
> • "Ranger Long did not deliberately or recklessly omit information from either probable cause affidavit and . . . if there were any unintentional omission[s] their inclusion would not have resulted" in the magistrate's refusing to issue the warrants.

16

In light of the trial court's findings regarding the weight and credibility of the evidence adduced at the *Franks* hearing, we hold that appellant did not show that Long omitted material facts from the April 6 affidavit either deliberately or with a reckless disregard for the truth.

Points of error thirteen, fourteen, and fifteen are overruled.

**RELIGIOUS FREEDOM**

In point of error twenty-one, appellant contends that the searches of the YFZ Ranch violated his rights under the Free Exercise Clause of the First Amendment. In point of error twenty, appellant contends that the searches violated the Texas Religious Freedom Restoration Act (TRFRA). *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 110.001-.012 (West 2011). That act provides that a government agency may not substantially burden a person's free exercise of religion unless the agency demonstrates that the application of the burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. *Id*. § 110.003(a), (b). Appellant urges that information learned and evidence seized during the searches should have been suppressed pursuant to article 38.23 as having been obtained in violation of the Free Exercise Clause and TRFRA.

The TRFRA defines "free exercise of religion" as "an act or refusal to act that is substantially motivated by sincere religious belief." *Id*. § 110.001(a)(1). The focus of the Act is on the degree to which a person's religious conduct is curtailed and the resulting impact on the person's religious expression. *Barr v. City of Sinton*, 295 S.W.3d 287, 301 (Tex. 2009). A person's religious exercise has been substantially burdened under the TRFRA when his ability to express adherence

17

to his faith through a particular religiously motivated act has been meaningfully curtailed or he has otherwise been significantly pressured to modify his conduct. *Id*. at 302.

The Supreme Court has said that the Fourth Amendment "must not be read in a vacuum," and that "[a] seizure reasonable as to one type of material in one setting may be unreasonable in a different setting or with respect to another kind of material." *Roaden v. Kentucky*, 413 U.S. 496, 501 (1973). Citing *Roaden*, appellant argues that a magistrate should take into consideration the values protected by the Free Exercise Clause before issuing a warrant to search a place of religious worship. In *Roaden*, the Supreme Court held only that the police may not rely on the exigency exception to the Fourth Amendment warrant requirement to make a seizure of allegedly obscene materials. *Id*. at 506. The Court has eschewed "any suggestion that the standard of probable cause in the First Amendment area is different than in other contexts . . . ." *New York v. P. J. Video*, 475 U.S. 868, 875 (1986). Instead, "the seizure of materials presumptively protected by the First Amendment should be evaluated under the same standard of probable cause used to review warrant applications generally." *Id*.

Appellant does not point to evidence that would support a finding that the searches conducted at the YFZ Ranch curtailed his ability to express adherence to his faith through a particular religiously motivated act or that the searches otherwise pressured him to modify his religious conduct. Similarly, appellant has not shown that the searches at issue limited his First Amendment right to freely exercise his religious faith. Because the searches were not shown to violate the Free Exercise Clause or TRFRA, we overrule points of error twenty and twenty-one.

18

### III. MOTION TO QUASH THE INDICTMENT

In his last four points of error, appellant challenges the trial court's denial of his motion to quash the indictment, which complained of impermissible grand jury procedures in Schleicher County. He contends that the grand jury selection process systematically excludes Hispanics and violates his equal protection, due process, and fair-cross-section rights under the United States Constitution, his equal protection and due course of law rights under the Texas Constitution, and various rights afforded an accused by the Texas Code of Criminal Procedure.

In his argument, however, appellant provides authority only for the contentions in regard to the United States Constitution. Because appellant does not provide separate authority or argument for his state constitutional claims, we do not address them.[3] *See Berry v. State*, 233 S.W.3d 847, 855 n.3 (Tex. Crim. App. 2007); *Heitman v. State*, 815 S.W.2d 681, 690-91 n.23 (Tex. Crim. App. 1991). In addition, because appellant proffers no argument or authority with respect to his claims regarding the statutory violations, we consider them inadequately briefed and as presenting nothing for our review. *See* Tex. R. App. P. 38.1(i); *Aldrich v. State*, 928 S.W.2d 558, 559 n.1 (Tex. Crim. App. 1996); *Hankins v. State*, 132 S.W.3d 380, 385 (Tex. Crim. App. 2004) (failure to adequately brief issue, either by failing to specifically argue and analyze one's position or provide authorities and record citations, waives any error on appeal); *see also Leza v State*, 351 S.W.3d 344, 358 (Tex. Crim. App. 2011).

---

[3] Further, appellant does not argue that the Texas Constitution provides more protection than the United States Constitution, so we properly resolve this case under only the Fifth, Sixth, and Fourteenth Amendments. *See Flores v. State*, 319 S.W.3d 697, 702 n.8 (Tex. Crim. App. 2010); *Muniz v. State*, 851 S.W.2d 238, 251 (Tex. Crim. App. 1993).

**STANDARD OF REVIEW**

In this case, we apply a bifurcated abuse-of-discretion standard of review to the trial court's determination of whether to quash or set aside an indictment. *See Thomas v. State*, 621 S.W.2d 158, 163 (Tex. Crim. App. 1981); *Haywood v. State*, 344 S.W.3d 454, 461 (Tex. App.—Dallas 2011, pet. ref'd); *Kassem v. State*, 263 S.W.3d 377, 384 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *see also State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004); *Guzman*, 955 S.W.2d at 89. A trial court abuses its discretion when it acts arbitrarily or unreasonably, without reference to guiding rules and principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990); *Smith v. State*, --- S.W.3d ----, 2012 WL 171694, *6 (Tex. App.—Austin Jan. 20, 2012, no pet. h.); *Taylor v. State*, 255 S.W.3d 399, 401 (Tex. App.—Texarkana 2008, pet. ref'd).

We acknowledge that the court of criminal appeals has held that an appellate court should review a trial judge's decision to deny a motion to quash an indictment *de novo*. *See Smith v. State*, 309 S.W.3d 10, 13-14 (Tex. Crim. App. 2010); *State v. Barbernell*, 257 S.W.3d 248, 251 (Tex. Crim. App. 2008) (citing *Moff*, 154 S.W.3d at 601). However, we note that the *de novo* standard of review has been applied primarily in cases involving motions to quash that complain about the sufficiency of the charging instrument. *See Smith*, 309 S.W.3d at 13-14; *Barbernell*, 257 S.W.3d at 250-52; *Moff*, 154 S.W.3d at 600-01; *State v. Rodgers*, 214 S.W.3d 644, 647 (Tex. App.—Eastland 2006, pet. ref'd). In *State v. Moff*, the court of criminal appeals held that the sufficiency of an indictment is a question of law that should be reviewed *de novo* because the trial court was not in a better position than the appellate court to make that determination. *Moff*, 154 S.W.3d at 601 (citing *Guzman*, 955 S.W.2d at 89).

The instant motion to quash, however, does not challenge the sufficiency of the indictment but rather the grand jury selection process that produced the grand jury that returned the indictment. Before *Moff*, appellate courts applied an abuse-of-discretion standard when reviewing decisions on motions to quash. *See Moff*, 154 S.W.3d at 601; *Thomas*, 621 S.W.2d at 163. We believe the change in the standard of review in *Moff* applies only in situations where the resolution of a question of law does not turn on an evaluation of the credibility and/or demeanor of a witness. *See Moff*, 154 S.W.3d at 601. In this case, the trial judge's decision was based on the motion to quash, evidence presented at a hearing on the motion—including conflicting testimony and multiple exhibits—and the argument of counsel, not merely the motion to quash, the indictment, and the argument of counsel as in *Moff*. Thus, in this case, because she had the opportunity to evaluate the credibility and demeanor of witnesses, the trial judge was in a better position than an appellate court to decide this issue. *See Moff*, 154 S.W.3d at 601. Accordingly, we believe the deferential abuse-of-discretion standard is the appropriate standard to apply in this case. *See Hassan v. State*, 346 S.W.3d 234, 238 (Tex. App.—Houston [14th Dist.] 2011, pet. granted); *Haywood*, 344 S.W.3d at 461; *Kassem*, 263 S.W.3d 384; *Rodgers*, 214 S.W.3d at 647.

Under an abuse-of-discretion review, the amount of deference we afford a trial judge's ruling "depends upon which 'judicial actor' is better positioned to decide the issue." *Moff*, 154 S.W.3d at 601 (citing *Guzman*, 955 S.W.2d at 89). We afford almost total deference to a trial court's determination of historical facts that are supported by the record, particularly when those findings are based on an evaluation of witness credibility and demeanor. *Guzman*, 955 S.W.2d at 89; *Haywood*, 344 S.W.3d at 461. We afford the same amount of deference to a trial court's rulings

21

on "application of law to fact questions," also known as "mixed questions of law and fact," if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 89. When the resolution of a question of law does not turn on an evaluation of the credibility and demeanor of a witness, the trial judge is in no better position than an appellate court to make the determination, so we conduct a *de novo* review of the issue. *Moff*, 154 S.W.3d at 601; *Guzman*, 955 S.W.2d at 89. Therefore, if a trial court's determination of a motion to quash an indictment turns on an evaluation of the credibility or demeanor of a witness, as in this case, we apply an abuse-of-discretion standard when reviewing the trial court's decision. *Haywood*, 344 S.W.3d at 461; *Hassan*, 346 S.W.3d at 238; *see Moff*, 154 S.W.3d at 601; *Guzman*, 955 S.W.2d at 89.

## EQUAL PROTECTION

An equal-protection violation occurs when the government purposefully excludes certain identifiable groups from serving on a grand jury. *Castaneda v. Partida*, 430 U.S. 482, 494-95 (1977); *Ovalle v. State*, 13 S.W.3d 774, 777 (Tex. Crim. App. 2000). To establish a *prima facie* case of an equal-protection violation, a defendant must show: (1) the particular group is a recognizable, distinct class that has been singled out for different treatment under the laws; (2) the degree to which the group was underrepresented by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time; and (3) the selection procedure is susceptible to abuse. *Partida*, 430 U.S. at 494; *Ovalle*, 13 S.W.3d at 777. Once a *prima facie* case of purposeful discrimination has been made, the burden shifts to the State to rebut that case. *Partida*, 430 U.S. at 495; *Ovalle*, 13 S.W.3d at 777. If the discrepancy between the

22

expected number and the actual number of the excluded race serving on grand juries is less than three standard deviations, the appellant fails to establish a *prima facie* case. *Ovalle*, 13 S.W.3d at 782; *see Partida*, 430 at 496 n.17.

## FAIR CROSS-SECTION

The Sixth Amendment requires that the panel from which a grand jury or a petit jury is selected represent a fair cross-section of the community.[4] *Taylor v. Louisiana*, 419 U.S. 522, 528-29 (1975); *Hernandez v. State*, 24 S.W.3d 846, 851 (Tex. App.—El Paso 2000, pet. ref'd). To establish a *prima facie* violation of the fair-cross-section requirement, a defendant must show: (1) the group allegedly excluded is a distinctive group in the community, (2) the group is not fairly represented on panels from which the juries are chosen, and (3) the underrepresentation results from a systematic exclusion of the group in the jury selection process. *Duren v. Mississippi*, 439 U.S. 357, 364 (1979); *Pondexter v. State*, 942 S.W.2d 577, 580 (Tex. Crim. App. 1997); *Hernandez*, 24 S.W.2d at 851. Once a *prima facie* case has been made, the burden shifts to the State to rebut that *prima facie* fair-cross-section violation by showing that the disproportionate exclusion manifestly and primarily advances a significant governmental interest. *Duren*, 439 U.S. at 367-68; *Aldrich*, 928 S.W.2d at 560.

The right to a fair cross-section of the community does not apply to the selection of a particular jury, or grand jury, itself. *Gray v. State*, 233 S.W.3d 295, 300 (Tex. Crim. App. 2007);

---

[4] We will assume, without deciding, that the Sixth Amendment constitutional right to a fair cross-section applies to state grand juries, although neither the United States Supreme Court nor the Texas Court of Criminal Appeals has so held.

23

*see Holland v. Illinois*, 493 U.S. 474, 483 (1990); *Lockhart v. McCree*, 476 U.S. 162, 173-74 (1986). The Supreme Court has refused to extend the fair-cross-section requirement to the actual selection of the petit jury, explaining that it had never used the "fair-cross-section principle" to demand that petit juries, as opposed to venire *panels*, represent the community. *Lockhart*, 476 U.S. at 173-74. "Defendants are not entitled to a jury of any particular composition." *Holland*, 493 U.S. at 483 (citing *Taylor*, 419 U.S. at 538); *Gray*, 233 S.W.3d at 301. Thus, the Supreme Court has not imposed a "requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." *Taylor*, 419 U.S. at 538 (internal citations omitted).

The Sixth Amendment's fair-cross-section requirement applies to the process by which the venirepersons are summoned to jury duty. *Gray*, 233 S.W.3d at 301; *see Pondexter*, 942 S.W.2d at 580-81. In the grand jury context, the fair-cross-section requirement concerns the process by which grand jurors are summoned to grand jury duty. Accordingly, it is the panels of those summoned to grand jury duty, not those selected to serve on the grand jury itself, that must fairly reflect the community. *See Taylor*, 419 U.S. at 538 ("the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof").

**GRAND JURY SELECTION**

In Texas, grand jurors may be selected using either a commissioner-based—or "key-man"—system or using the random selection system used to select civil trial juries. *See* Tex. Code Crim. Proc. Ann. art. 19.01 (West 2005); *Ovalle*, 13 S.W.3d at 778. Under the "key-man" system, jury commissioners appointed by a district judge select and make a list of prospective grand

jurors. *See* Tex. Code Crim. Proc. Ann. arts. 19.01(a), 1906 (West Supp. 2011). The district judge has discretion in appointing grand jury commissioners, and the commissioners, in turn, have discretion in selecting persons to summon for the grand jury panel. Schleicher County uses the "key-man" system.

The Texas statutory scheme is not in itself unfair, "[b]ut by reason of the wide discretion permissible in the various steps of the plan, it is [. . . ] capable of being applied in such a manner as practically to proscribe any group thought by the law's administrators to be undesirable." *Smith v. Texas*, 311 U.S. 128, 131 (1941). Consequently, the United States Supreme Court has held that the commissioner-based system, while facially constitutional, is susceptible to abuse. *Partida*, 430 U.S. at 497; *Ovalle*, 13 S.W.3d at 778.

Appellant complains that "[t]he key man system is susceptible to abuse that occurs on a number of levels within the process of the selection of the grand jury, in the choice of commissioners, the panel members, and the forepersons."[5] He argues that the statistics show that the judges and grand jury commissioners in Schleicher County have "exercised [their unfettered] discretion in a manner that has consistently produced grand juries that under-represent Hispanics in

---

[5] Although appellant complains that "the discretion-driven system deprives Hispanics of an equal opportunity to serve as grand jury forepersons," the court of criminal appeals, while acknowledging the existence of adverse authority from some federal circuits, has held that so long as there has been no purposeful exclusion from the grand jury as a whole, the race of the grand jury foreperson is of no consequence because the foreperson's duties are ministerial in nature and do not affect the outcome of the grand jury's decision. *Mosley v. State*, 983 S.W.2d 249, 255-56 (Tex. Crim. App. 1998); *Rousseau v. State*, 855 S.W.2d 666, 687-88 (Tex. Crim. App. 1993); *see Hobby v. United States*, 468 U.S. 339, 344-46 (1984). As an intermediate appellate court, we follow the binding precedent of the court of criminal appeals. *Gonzales v. State*, 190 S.W.3d 125, 130 n.1 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd); *State v. Stevenson*, 993 S.W.2d 857, 867 (Tex. App.—Fort Worth 1999, no pet.).

a constitutionally significant manner." He attacks the way the statutory method of grand jury selection has been administered by both the judges and the jury commissioners throughout the multiple stages of the grand jury selection process.

## EVIDENCE OF UNDERREPRESENTATION

During the eleven-hour hearing on his motion to quash, appellant presented evidence consisting of Schleicher County grand jury lists for 1989 through 2008 (the preceding 20 years, including the grand jury that returned appellant's indictment), census materials from 2000, census estimates from 2008, and expert testimony.[6] However, for the reasons discussed below, the evidence appellant presented showed no definitive demographic conclusions about the number of Hispanics who served on grand juries during that time, the number of Hispanics called to serve on grand juries (those on the panels summoned by the commissioners), or the number of Hispanics who were eligible to serve as grand jurors.[7] *See Ovalle*, 13 S.W. 3d 774, 779-80 & n.22.

First, appellant relied upon Spanish surnames to determine whether or not individuals were of Hispanic origin. The court of criminal appeals, however, has recognized that "[u]ncertainty . . . inheres in the use of Spanish surnames to determine Hispanic origin." *Ovalle*, 13 S.W.3d at 780. We agree that relying on surnames is not a reliable indication of the heritage of individuals chosen

---

[6] Appellant did not present any statistical evidence regarding the Hispanic population—total population, adult population, or registered voter population—for the period of 1989 to 1999, although he used grand jury data from that period to support his claim of underrepresentation.

[7] We accept, and the State does not dispute, that Hispanics are "a recognizable, distinct class" for equal protection purposes, *see Partida*, 430 U.S. at 495; *Ovalle*, 13 S.W.3d at 777-78, as well as "a distinctive group in the community" for fair-cross-section purposes. *See Aldrich*, 928 S.W.2d at 560.

for grand jury service. In fact, this case demonstrates that very uncertainty and unreliability. Testimony during the hearing on the motion showed that at least thirty-two individuals summoned by the grand jury commissioners who appellant believed were non-Hispanic were known to be Hispanic by either the district clerk or other county officials. Testimony at the hearing also revealed that appellant mistakenly believed one of the individuals on appellant's grand jury panel to be Hispanic when in fact she was a non-Hispanic married to a Hispanic.

Second, appellant presented multiple statistics to depict the Hispanic representation on the grand juries. In his motion to quash, appellant relied upon the number of Hispanic grand jurors who served, as well as Hispanic alternates selected. However, he omitted alternates in the evidence presented at the hearing.[8] Further, appellant presented multiple statistics to represent the population of Hispanics eligible for grand jury service.[9] In his motion, he relied on the percentage of Hispanic registered voters in Schleicher County in 2008 and the percentage of Hispanics in the adult population of Schleicher County in 2000. At the hearing, however, he relied upon the percentage of Hispanics in the total population of Schleicher County in 2000, the percentage of

---

[8] At times, however, appellant's expert testified about statistics that he calculated using numbers that included alternates.

[9] The court of criminal appeals has concluded that the population of persons eligible to serve on grand juries is a better baseline figure from which to gauge discrimination than the general population. *Ovalle*, 13 S.W.3d at 779. As the court stated: "Using general population figures requires making the assumption that they are similar enough to the eligible population figures to yield an accurate comparison. In essence, one must assume that groups ineligible for jury service, such as children and resident aliens, do not compose a disproportionate percentage of the Hispanic population as compared to the non-Hispanic population. Given that Texas borders on Mexico, however, there is at least some reason to believe that Census figures for Hispanics may include more resident aliens than would be true of non-Hispanics, causing the figures for Hispanic population to overstate the percentage of the population that is actually available for grand jury service." *Id.* at 779-80.

Hispanics in the adult population of Schleicher County in 2000, as well as the percentage of Hispanics in the total population of Schleicher County in 2008. While appellant's expert testified about significant changes in the Hispanic population in Schleicher County over the twenty-year period, including significant increases in the population of Hispanic children, he did not provide statistics incorporating or accounting for those changes. Appellant's statistics also appear to have failed to account for the number of foreign-born persons in Schleicher County, in either 2000 or 2008, which could affect eligibility to serve on a grand jury in terms of citizenship.[10] *See* Tex. Code Crim. Proc. art. 19.08 (West Supp. 2011) (to be qualified to serve as grand juror, person must be citizen of state and county and qualified to vote in county); Tex. Elec. Code Ann. § 11.002(1), (2), (5) (West Supp. 2011) (qualified voter must be 18 years of age or older, United States citizen, and resident of this state).

The trial court, relying on the various statistics presented to the court in the motion and at the hearing, concluded that 22 of 72 grand jurors who served on the past six grand juries, or 30.55%, had Hispanic surnames or were identified as being Hispanic. She compared this to the 31% of registered voters being Hispanic—a statistic appellant presented and relied on in his motion to quash—and concluded that appellant failed to establish a *prima facie* case of underrepresentation.[11]

---

[10] Two of the statistics noted by the trial court were the fact that 13.9% of the total population of Schleicher County in 2000 was foreign born and that 40.6% of the households of Schleicher County in 2000 were households where a language other than English was spoken in the home by individuals over five years of age.

[11] Because of the problems noted by the court of criminal appeals in using general population figures, as well as the court's recognition of groups ineligible for jury service, such as children and resident aliens, *see supra* notes 7-8, we do not find the trial court's use of the percentage of Hispanic registered voters as representative of Hispanics eligible to serve on grand juries to be unreasonable. *See also* Tex. Code Crim. Proc. Ann. art. 19.08 (West Supp. 2011) (to be qualified to serve as grand

The trial court did not include an analysis of the statistical deviation in her findings of fact and conclusions of law. However, using the statistics relied upon by the court, the discrepancy between the expected number and actual number of Hispanics serving on Schleicher County grand juries is less than three standard deviations. Using the percentage of Hispanic registered voters as representing the population of persons eligible to serve on grand juries, one would expect about 23 Hispanic persons to have served on the six grand juries.[12] The standard deviation is approximately four.[13] Thus, the discrepancy between the expected number and the actual number of Hispanics serving on Schleicher County grand juries is less than three standard deviations because the actual number of Hispanics who served on the grand juries, 22, is more than eleven.[14] If a statistical showing of the discrepancy is less than three standard deviations, an appellant fails to establish a *prima facie* case.[15] *Ovalle*, 13 S.W.3d at 782; *see Partida*, 430 U.S. at 496 n.17.

---

juror, person must be citizen of state and county and qualified to vote in county); Tex. Elec. Code Ann. § 11.002(a)(1), (2), (5) (West Supp. 2011) (qualified voter must be 18 years of age or older, United States citizen, and resident of this state).

[12] 31% of 72 = 22.32.

[13] Determined by finding the square root of the product of the total number in the sample (72) times the probability of selecting a Hispanic person (0.31) times the probability of selecting a non-Hispanic person (0.69), and rounding to the nearest whole number: $\sqrt{72 \times 0.31 \times 0.69}$ = 3.92. *Se Ovalle*, 13 S.W.3d at 782 n.29; *Partida*, 430 U.S. at 496 n.17.

[14] 22.32 – (3.92 *x* 3) = 10.56. *See Ovalle*, 13 S.W.3d at 782 & n.22.

[15] Appellant complains that the trial court improperly restricted her review to only the three years prior to his indictment. However, we note that the court of criminal appeals, in an unpublished opinion, held that an appellant failed to establish a *prima facie* case of underrepresentation based upon statistics from the two-year period and eight most recent grand juries prior to an appellant's indictment. *See Adams v. State*, No. AP-75023, 2007 WL 1839845, *4-5 (Tex. Crim. App. 2007).

Moreover, appellant complains of the grand jury selection process based on the exercise of discretion by the judges and grand jury commissioners throughout the process, yet supports his claim by narrowly focusing on those who served as grand jurors. The criticism of the commissioner-based system is that it potentially allows discrimination to invade the process at several points: first, when the district judge selects and appoints grand jury commissioners, *see* Tex. Code of Crim. Proc. art. 19.01; second, when the grand jury commissioners select individuals to be summoned for grand jury service, *see id.* art. 19.06; and third, when the district judge disqualifies or excuses summoned individuals prior to impaneling the grand jury, *see id.* arts. 19.19, 19.21 (West 2005). Thus, logically, a review of any alleged underrepresentation of Hispanics based upon discrimination in the grand jury selection process would, if possible, include a review of the selections made at all three stages: the appointment of grand jury commissioners, the selection of those summoned for grand jury panels, and the selection of impaneled grand jurors. Arguably, the first two stages of the process are more susceptible to discrimination because the discretion is unfettered, whereas in the final stage the exercise of the judge's discretion is governed by statute. *See id.* arts. 19.08 (qualifications of grand juror), 19.21 (requirement to test qualifications), 19.23 (mode of testing qualifications), 19.25 (excuses from service).

A review of the selections made during the first stage—the appointment of grand jury commissioners—does not reveal a statistically significant underrepresentation of Hispanics as grand jury commissioners.[16] The record reflects that from October 2000 to April 2008, 14 of the

---

[16] To conduct our analysis of the three stages of the selection process, we review the grand jury panels from October 2000 to April 2008, which are contained in the record. Except for October 1996 and October 1997, which we do not include in this analysis, the record does not contain

30

51 individuals selected by the district judges to serve as grand jury commissioners, or 27.45%, had Hispanic surnames or were identified as being Hispanic. When compared to the percentage of Hispanic registered voters, a disparity of 3.55% exists. Conducting an analysis of the standard deviation, the discrepancy between the expected number and actual number of Hispanics chosen by the judges to serve as grand jury commissioners is less than three standard deviations. Using the percentage of Hispanic registered voters as representing the population of persons eligible to serve as grand jury commissioners, one would expect about 16 Hispanic persons to have been selected to serve as grand jury commissioners.[17] The standard deviation is approximately three.[18] So, the discrepancy between the expected number and the actual number of Hispanics serving as Schleicher County grand jury commissioners is less than three standard deviations because the actual number of Hispanics appointed as grand jury commissioners, 14, is more than six.[19] Once again, if a statistical showing of the discrepancy is less than three standard deviations, the appellant fails to

information about any other grand jury panels. We obtain information about the grand jury commissioners from these lists of grand jury panels. For the sake of a consistent comparison, we use the same time frame—which we conclude represents a significant period of time—to review the selected grand jurors.

   We note that there is additional information concerning the grand jury commissioners in the record of the appeal of one of appellant's co-defendants who joined in the motion to quash, which the State cites in its brief. That information, however, was presented as evidence during a hearing on a motion for new trial in that case, not the joint motion to quash. That record has not been filed in the instant appeal and is, therefore, not in the record before us in this case.

   [17] 31% of 51 = 15.81.

   [18] Determined by finding the square root of the product of the total number in the sample (51) times the probability of selecting a Hispanic person (0.31) times the probability of selecting a non-Hispanic person (0.69), and rounding to the nearest whole number: $\sqrt{51 x 0.31 x 0.69}$ = 3.30. *See Ovalle*, 13 S.W.3d at 782 n.29; *Partida*, 430 U.S. at 496 n.17.

   [19] 15.81 – (3.30 *x* 3) = 5.91. *See Ovalle*, 13 S.W.3d at 782 & n.22.

31

establish a *prima facie* case of an equal protection violation. *Ovalle*, 13 S.W.3d at 782; *see Partida*, 430 U.S. at 496 n.17.

The record reflects that the selections made by grand jury commissioners during the second stage do not demonstrate a statistically significant underrepresentation of Hispanics on grand jury panels. From October 2000 to April 2008, 114 of the 432 individuals selected by the grand jury commissioners, or 26.39%, had Hispanic surnames or were identified as being Hispanic. When compared to the percentage of Hispanic registered voters, a disparity of 4.6% exists. Conducting an analysis of the standard deviation, the discrepancy between the expected number and actual number of Hispanics selected by the Schleicher County grand jury commissioners for grand jury panels is less than three standard deviations. Using the percentage of Hispanic registered voters as representing the population of persons eligible to serve on grand juries, one would expect about 134 Hispanic persons to have been selected for the grand jury panels.[20] The standard deviation is approximately ten.[21] Thus, the discrepancy between the expected number and the actual number of Hispanics selected by grand jury commissioners for Schleicher County grand jury panels is less than three standard deviations because the actual number of Hispanics summoned for the grand jury panels, 114, is more than 106.[22] Again, if a statistical showing of the discrepancy is less than three

---

[20] 31% of 432 = 133.92.

[21] Determined by finding the square root of the product of the total number in the sample (432) times the probability of selecting a Hispanic person (0.31) times the probability of selecting a non-Hispanic person (0.69), and rounding to the nearest whole number: $\sqrt{432 x 0.31 x 0.69}$ = 9.6
*See Ovalle*, 13 S.W.3d at 782 n.29; *Partida*, 430 U.S. at 496 n.17.

[22] 133.92 – (9.61 x 3) = 105.09. *See Ovalle*, 13 S.W.3d at 782 & n.22.

standard deviations, the appellant fails to establish a *prima facie* case of an equal protection

violation. *Id.* In addition, this statistical discrepancy fails to establish a *prima facie* case of a

fair-cross-section violation. *See Pondexter*, 942 S.W.2d at 580-81; *see, e.g.*, *U.S. v. Maskeny*,

609 F.d 183, 190 (5th Cir. 1980); *Thompson v. Sheppard*, 490 F.2d 830, 832 (5th Cir. 1974).

Finally, if we review the grand jurors selected from October 2000 to April 2008, the

record does not reflect a statistically significant underrepresentation of Hispanics among those

selected to serve on grand juries.[23] The record reflects that during that time period, 47 of the

210 individuals selected for service on the grand jury, or 22.38%, had Hispanic surnames or were

identified as being Hispanic. When compared to the percentage of Hispanic registered voters, a

disparity of 8.62% exists. Conducting an analysis of the standard deviation, the discrepancy between

the expected number and actual number of Hispanics selected to serve as grand jurors is less than

three standard deviations. Using the percentage of Hispanic registered voters as representing the

population of persons eligible to serve on grand juries, one would expect about 66 Hispanic persons

to have been selected as grand jurors.[24] The standard deviation is approximately seven.[25] So, the

---

[23] We include alternates in the count for purposes of evaluating the representation of Hispanics among those selected to serve. *Partida* refers to those "called to serve as grand jurors," and alternates are called to serve—that is, they are selected for service—whether or not their service is actually necessary. *See Partida*, 430 U.S. at 496. However, while not presented in this opinion, we also conducted a statistical analysis using the data of grand jurors, excluding alternates, and found that the discrepancy is likewise not statistically significant.

[24] 31% of 210 = 65.10.

[25] Determined by finding the square root of the product of the total number in the sample (210) times the probability of selecting a Hispanic person (0.31) times the probability of selecting a non-Hispanic person (0.69), and rounding to the nearest whole number: $\sqrt{210 \times 0.31 \times 0.69}$ = 6.7 *See Ovalle,* 13 S.W.3d at 782 n.29; *Partida*, 430 U.S. at 496 n.17.

33

discrepancy between the expected number and the actual number of Hispanics selected to serve as Schleicher County grand jurors is less than three standard deviations because the actual number of Hispanics selected to be grand jurors, 47, is more than forty-five.[26]

Based upon the foregoing, we hold that the trial court could have reasonably concluded that the record in this case does not show a statistically significant underrepresentation of Hispanics among those appointed as grand jury commissioners, those summoned for grand jury panels, or those selected to serve as grand jurors in Schleicher County. *See Ovalle*, 13 S.W.3d at 782; *Pondexter*, 942 S.W.2d at 580-81. Accordingly, appellant failed to establish a *prima facie* case of either an equal protection violation or a fair-cross-section violation. *See id.* We overrule points of error twenty-two, twenty-four, and twenty-five.

## DUE PROCESS

Appellant also raises a general due process claim under *Peters v. Kiff*, 407 U.S. 493 (1972) (plurality). Due process may be offended if the jury panel is selected in an arbitrary and discriminatory manner. *Id.* at 502; *Aldrich*, 928 S.W.2d at 560; *Hernandez*, 24 S.W.3d at 851; *see Bird v. State*, 692 S.W.2d 65, 78 (Tex. Crim. App. 1985). In *Peters* the United States Supreme Court, in a plurality opinion, declared that a state criminal defendant, whatever his race, has standing to challenge the system used to select his grand or petit jury on the ground that it arbitrarily excludes from service the members of any race and therefore denies him due process of law, it not being

---

[26] $65.10 - (6.70 \ x \ 3) = 45.0$. *See Ovalle*, 13 S.W.3d at 782 & n.22.

necessary that the defendant show actual harm or bias. *Peters*, 407 U.S. at 502-04. This is a due process violation not involving an equal-protection or fair-cross-section violation.

The record in this case does not show an arbitrary or systematic exclusion of Hispanic individuals from grand jury service in Schleicher County as contended by appellant. *See Aldrich*, 928 S.W.2d at 560; *Bird*, 692 S.W.2d at 78. Moreover, the trial court could reasonably have concluded that the grand jury that indicted appellant was not selected on an impermissible basis nor was constituted in a manner prohibited by the constitution or by statute. The grand jury was not plainly illegal in its composition. *Peters* is not controlling.

Having examined the entire record, we conclude that no violation of due process is shown. Absent an infringement of the fundamental right to fairness as guaranteed by the due process of law, no basis exists to reverse appellant's conviction or set aside the indictment against him. *See Bird*, 692 S.W.2d 65, 78 (Tex. Crim. App. 1985); *cf. Hobby v. United States*, 468 U.S. 339 (1984). We overrule point of error twenty-three.

## IV.  CONCLUSION

We hold that the trial court did not abuse its discretion in denying either appellant's motion to suppress or motion to quash the indictment. The judgment of conviction is affirmed.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Pemberton and Henson

Affirmed

35

Filed:   February 24, 2012

Do Not Publish

Affiant has probable cause for said belief by reason of the following facts, to-wit:

Affiant is Leslie Brooks Long, a certified peace officer under the laws of the State of Texas for approximately 19 years. Affiant is currently employed by the Texas Department of Public Safety as a Texas Ranger and has investigated criminal offenses in the State of Texas, including the criminal offense of Sexual Assault of a Child. Affiant has received training from the Texas Department of Public Safety Training Academy in Austin, Texas, including specialized Criminal Law Enforcement training in reference to offenses identified as Sexual Assault of a Child. Affiant has personally been on the premises of the YFZ Ranch on multiple occasions over the past four years and knows that it is located as described above as the Suspected Place and Premises. Also, Affiant has now been to the Suspected Place and Premises on April 4, 2008, April 5, 2008, and April 6, 2008, for many hours each day. At the Suspected Place and Premises, Affiant entered the gate described in the Suspected Place and Premises, drove further onto the property and observed another fence and gate within the ranch. At the interior gate, Affiant observed a small, enclosed, roofed building with tinted windows and antennae believed to be used in the purpose of communications. This structure is built a few feet above ground. Based on these observations and Affiant's training and experience, Affiant believes this building is a surveillance platform, guard tower or guard house. Affiant has personally spoken with Frederick Merril Jessop, as recently as April 5, 2008, who identified himself as the point of contact to law enforcement involving any requests or needs from the YFZ Ranch, hereafter referred to as the Suspected Place and Premises. Affiant has personally observed other persons at the YFZ Ranch seek authorization from Frederick Merril Jessop to respond to questions from law enforcement and other government officials. Frederick Merril Jessop advised Affiant that Frederick Merril Jessop resides at the Suspected Place and Premises and has presented himself to Affiant as the authority at the Suspected Place and Premises. Affiant observed that numerous other people were present at the Suspected Place and Premises and Frederick Merril Jessop on April 4, 2008, advised Affiant that around two hundred fifty men, women and children reside at the Suspected Place and Premises. The occupants of the residential structures on the Suspected Place and Premises have been not been identified to Affiant.

On April 5, 2008, while conducting a search of the Suspected Place and Premises under authority of Search and Arrest Warrant number M-08-001-S, out of the 51st Judicial District of Texas, for the County of Schleicher, a copy of which is attached hereto with accompanying affidavit as "Attachment A" for all purposes, Affiant made the following observations: within a large building, that Affiant heard the residents at the Suspected Place and Premises refer to as a Temple, hereafter referred to as the "Temple," Affiant observed multiple locked safes, locked desk drawers, locked vaults, as well as multiple computers and beds. On one of the beds within the Temple, Affiant observed that the bed linens were disturbed as if the bed had been used and Affiant observed a strand of hair believed to have come from the head of a female. Affiant believes the strand of hair belongs

37

to a female because Affiant has seen numerous male residents at the Suspected Place and Premises and all of the males observed by Affiant wear their hair shorter than the strand of hair observed by Affiant.

On April 5th and 6th, 2008, Affiant observed a building similar in appearance to the Temple, but smaller in size that is built away from the Temple, that Affiant will hereafter refer to as the Temple Annex. Inside the Temple Annex, Affiant observed multiple safes and a computer and computer peripherals.

On April 6, 2008, Affiant has personally spoken with Tina Martinez, an employee with the Texas Department of Protective and Family Services who personally interviewed a child who identified herself as Yvonne Jessop on April 4th or 5th of 2008; Yvonne Jessop said she is fifteen years of age; that Yvonne Jessop knows a child named Suzanne Johnson who is sixteen years of age and was spiritually united (married); Yvonne Jessop further advised Tina Martinez that Suzanne Johnson had a baby and is pregnant and resides at the Suspected Place and Premises.

Tina Martinez also advised Affiant that she interviewed a child on April 4, 2008, who appeared to be approximately sixteen years of age who identified herself as Lee Ann Nelson Jessop; that Tina Martinez asked Lee Ann Nelson Jessop her age in the presence of Lee Roy Jessop; that, before responding to Tina Martinez' question, Lee Ann Nelson Jessop looked at Lee Roy Jessop; that Lee Roy Jessop told Lee Ann Nelson Jessop, "you are eighteen;" after which Lee Ann Nelson Jessop advised that she is eighteen with a date of birth of March 24, 1990; that Lee Ann Nelson Jessop advised Tina Martinez that she has a baby that is ten months old, that she is spiritually united with Lee Roy Jessop who is approximately thirty-three years of age; that Lee Ann Nelson Jessop is the fourth wife of Lee Roy Jessop who is still married to the other three wives.

On April 6, 2008, Tina Martinez further advised Affiant that, between this date and April 4, 2008, she interviewed a child who identified herself as Pamela Jessop with a date of birth of 12/9/1989 who advised that she has a son named Matthew Jessop who was born 8/1/2006; that Pamela Jessop advised that the father of Matthew Jessop is Jackson Jessop who is thirty-six years old.

On April 6, 2008, Tina Martinez advised Affiant that, between this date and April 4, 2008, Tina Martinez interviewed a female who identified herself as Janet Jeffs Jessop with a date of birth of 9/16/1988 who advised Tina Martinez that she has a daughter named Diana Ziana Jessop who was born 8/19/2005 and she has another daughter named Spiritual Unity Jessop who was born 8/12/2004.

Also on April 6, 2008, Affiant has personally spoken with Ruby Gutierrez, an employee with the Texas Department of Protective and Family Services who personally interviewed a child who identified herself as Josie Steed between this date and April 4, 2008. Ruby Gutierrez advised Affiant that Josie Steed told Ruby Gutierrez that a resident of the Suspected Place and Premises,

Sarah Johnson, is sixteen and has been spiritually united (married) to Joseph Jeffs who is approximately forty years of age.

Also on April 6, 2008, Affiant has personally spoken with Rebecca Baxter, an employee with the Texas Department of Protective and Family Services who, between this date and April 4, 2008, has personally interviewed a child who identified herself as Teresa Steed Jessop, with a date of birth of sixteen years of age; Teresa Steed Jessop advised Rebecca Baxter that Teresa Steed Jessop is pregnant and due to give birth in June 2008 and that Teresa Steed Jessop is married to Nathan Jessop whose first wife, to whom Nathan Jessop is also still currently married, is approximately forty years of age.

On April 6, 2008, Rebecca Baxter also advised Affiant that, between this date and April 4, 2008, she interviewed a female who appeared to be approximately sixteen years of age, identified herself as Arta Jessop Barlow, and advised Rebecca Baxter that Arta Jessop Barlow does not know her own age, but that she has given birth to a child who is now two years old and that she is currently pregnant again. On April 6, 2008, Rebecca Baxter advised Affiant that, between this date and April 4, 2008, she interviewed a child who identified herself as Viola Barlow, age 8, who advised that: Arta Jessop Barlow has four children and Arta Jessop Barlow is under sixteen years of age; that Arta Jessop Barlow is spiritually united to Richard Jessop Barlow; that Richard Jessop Barlow is the father of Viola Barlow; that Viola Barlow's mother, Susan Black Barlow, is the first wife of Richard Jessop Barlow; that Arta Jessop Barlow is the second wife of Richard Jessop Barlow; and that both wives are still alive and married to Richard Jessop Barlow.

Affiant has been advised by Schleicher County Sheriff David Doran that Sheriff Doran has worked with residents at the Suspected Place and Premises over the past four years. Sheriff Doran advised Affiant that he has learned from the residents at the Suspected Place and Premises that the residents all belong to the religious group the Fundamentalist Church of Jesus Christ of Latter-Day Saints (hereafter referred to as FLDS). On April 6, 2008, Sheriff Doran advised Affiant that, over the past four years, Sheriff Doran has worked with a confidential informant who is a former member of the FLDS; that the confidential informant has provided Sheriff Doran with information regarding the FLDS on more than twenty occasions over the past several years and, that on each occasion, the information was proven to be reliable, true and correct; that the confidential informant has continued to provide Sheriff Doran reliable information as recently as April 5, 2008; that, on April 5, 2008, the confidential informant advised Sheriff Doran of the following: that adult male FLDS church members over the age of seventeen engage in the practice of marrying multiple wives, at the initial time of the marriage, the bride is often under the age of sixteen years: and that the temple at the Suspected Place and Premises contains an area where there is a bed where males over the age of seventeen engage in sexual activity with female children under the age of seventeen.

As stated above, on April 5, 2008, Affiant observed a bed within the Temple that has disturbed bed linens and a strand of hair that appears to be from a female head.

Furthermore, while conducting a search of the Suspected Place and Premises under the authority of Search Warrant number M-08-001-S, on April 5, 2008, Affiant while agents were searching for documents pertinent to that Search Warrant, Affiant personally observed a document indicating marriages between one man and over twenty wives, all of whom resided in the same residence at the Suspected Place and Premises, as of August 9, 2007, with no record of divorce or death of a spouse found.